LITTON SYSTEMS, INC., Appellant,

v.

SUNDSTRAND CORPORATION, A Delaware Corp., et al., Appellees.

Appeal No. 84–1356.

United States Court of Appeals, Federal Circuit.

Dec. 19, 1984.

Frederick A. Lorig, Kendrick, Netter & Bennett, Los Angeles, Cal., argued for appellant. With him on the brief was Elwood S. Kendrick, Los Angeles, Cal., and Allen M. Sokal, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C.

Gregory A. Long, Overton, Lyman & Prince, Los Angeles, Cal., argued for appellees. With him on the brief were Walther E. Wyss, Mason, Kolehmainen, Rathburn & Wyss, Chicago, Ill., Richard J. Hoskins, Schiff, Hardin & Waite, Chicago, Ill., was also on brief.

Before MARKEY, Chief Judge, NICHOLS, Senior Circuit Judge, and BISSELL, Circuit Judge.

MARKEY, Chief Judge.

Appeal from an order of the United States District Court for the Central District of California denying Litton Systems' (Litton's) motion for preliminary injunction. We *affirm.*

## Background

Litton makes and sells, as do others, a ring laser gyroscope (RLG), formed normally of a thermally and mechanically stable block of quartz ceramic material. Counter-rotating laser beams are generated in a cavity in the block and are reflected around the cavity by high quality, almost totally reflective mirrors affixed to the corners of the block. Any imperfection in mirror alignment can result in a plane or missile carrying the RLG to wander miles off course.

On December 27, 1983, Litton filed a complaint for infringement of six patents and misappropriation of unidentified "confidential information and trade secrets" relating to RLGs. The complaint was filed against the Sundstrand Corporation, Sundstrand Data Control, Inc. (SDC), Sundstrand Optical Technologies, Inc. (Optec), Global Systems, Inc. (Global), Daryl C. Stjern (Stjern) and George L. Dobson (Dobson). Dobson was one of the founders of

the predecessor of Optec. Optec is a wholly-owned subsidiary of SDC which, like Global, is a wholly-owned subsidiary of Sundstrand Corporation. Stjern is Vice-President of Optec. The defendants are referred to here as "Sundstrand".

Litton filed an application for a temporary restraining order (TRO) and a preliminary injunction on December 29, 1983. Citing Sundstrand's disclosures in a brochure and at trade shows, Litton sought to enjoin Sundstrand from disclosing any of Litton's trade secrets, and proposed that Sundstrand submit to Litton's designee any RLG related materials that might contain such secrets.

The district court entered a stipulated TRO on January 4, 1984, restraining Sundstrand:

> (a) From publishing, disclosing, or communicating to any third parties the technology used in designing, testing, or producing of ring laser gyroscopes ... unless plaintiff's approval is first obtained or from destroying or permanently altering any documents referring or relating to said designing, testing or producing. Plaintiff may not withhold its approval, referenced above, unless it reasonably believes its trade secrets will thereby be disclosed.

During the next five months, the parties filed more than 2,200 pages of briefs, exhibits, and deposition testimony. The court ordered Sundstrand to produce any documents relating to RLG technology which had been disclosed to third parties. Litton took 100 photographs at Sundstrand's RLG facility.

Sundstrand demanded that Litton identify its trade secrets so that it could defend by showing that those asserted trade secrets are either not secrets or not used by Sundstrand.

Litton said it would take eight months to list its "thousands" of secrets. The district court twice ordered Litton to identify its trade secrets. Litton first produced a list of more than 300 "areas", (e.g., "data analysis method") which it said contained unidentified trade secrets. Litton later cut its list to 239 "areas" and produced boxes of documents which it said contained still unidentified trade secrets. The parties dispute the question of whether Litton ever specified any trade secrets, and if it did, whether they numbered 2, 6, or 17.

The district court continued the TRO for five months to allow time for briefing and hearing of three motions on scope of discovery, for Litton to list its trade secrets, and for drafting and filing papers relating to Litton's motion for a preliminary injunction.

During the TRO period, Sundstrand submitted three documents to Litton's counsel, and obtained permission to disclose two, one having been disclosed before entry of the TRO and referring to a type of RLG that Litton does not make, the other being a government report.

The district court conducted a hearing on the motion for preliminary injunction on May 30, 1984. It denied Litton's motion, dissolved the TRO, and instructed Sundstrand to propose findings of fact. The court rejected three, modified six, and adopted twelve of Sundstrand's 21 proposed findings. Of those adopted and modified, the first ten recited background facts (e.g., states of incorporation, corporate relationships of defendants, number of Sundstrand employees).

The court's findings state that the motion is a "toss up" on the merits, that "there are serious questions going to the merits", and that Litton "failed to demonstrate a likelihood of success on the merits." The court found that Litton had not demonstrated that it would suffer irreparable injury and that the balance of hardships tilted against granting the injunction. Litton's unsolicited proposed findings were rejected.

The district court found that the requested injunction would be against use of trade secrets, and would be devastating to Sundstrand because it would "effectively" prevent it from communicating with potential and existing customers and suppliers.

In its conclusions of law, the district court repeated its findings on likelihood of success and balance of hardships.

Litton filed a notice and amended notice of appeal to this court and moved the district court to reinstate the TRO during pendency of the appeal. The district court denied Litton's motion, finding that the proposed reinstatement "would not maintain the status quo ... the relevant status quo ... [being] the state of affairs prior to bringing the instant action." The district court also found that:

> ... an injunction pending appeal may cause defendants irreparable harm in that defendants have contracts to deliver ring laser gyroscopes ("RLGs") pending and are seeking certification from the Federal Aviation Administration, and an injunction pending appeal would effectively enjoin defendants from disclosing any information regarding design and technology of RLGs.

Litton moved under FRAP 8 for an order from this court reinstating the TRO. This court denied the motion.

### Issue

Did the district court abuse its discretion, commit an error of law, or seriously misjudge the evidence when it denied Litton's motion for a preliminary injunction?

### OPINION

■ In *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579, 219 USPQ 686, 691 (Fed.Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 493, 78 L.Ed.2d 687, 220 USPQ 385 (1983), this court noted the widely recognized test for reviewing a denial of a preliminary injunction:

> One denied a preliminary injunction must meet the heavy burden of showing that the district court abused its discretion, committed an error of law, or seriously misjudged the evidence. *Eli Lilly and Co. v. Premo Pharmaceutical*

*Labs., supra* [630 F.2d 120, 207 USPQ 719, (3rd Cir.), *cert. denied,* 449 U.S. 1014 [101 S.Ct. 573, 66 L.Ed.2d 473] 208 USPQ 88 (1980)]. The district court's discretion is not absolute, however, and must be measured against the standards governing the issuance of injunctions. *Singer Co. v. P.R. Mallory & Co., Inc., supra,* at 234 [671 F.2d 232, 213 USPQ 202 (7th Cir.1982)]; *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976).

*Smith, Int'l* involved a preliminary injunction in a patent case within the exclusive appellate jurisdiction of this court. The Ninth Circuit has in a trade secret case emphasized "abuse of discretion" as the standard. *Dekar Industries, Inc. v. Bissett-Berman Corp.,* 434 F.2d 1304 (9th Cir. 1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971). Though we respond here to Litton's arguments devoted to alleged misjudgment of the evidence, we apply the Ninth Circuit standard, finding no abuse of discretion in the district court's evaluation of relative hardship.

In its Conclusion of Law 2, the district court cited *Benda v. Grand Lodge of Int'l Ass'n.,* 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed,* 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979), and *Aguirre v. Chula Vista Sanitary Serv.,* 542 F.2d 779 (9th Cir.1976), from which it quoted the discernable standard applicable in the Ninth Circuit and applied by this court in this case:

> One moving for a preliminary injunction assumes the burden of demonstrating either a combination of probable success and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor.

As the district court indicated (a "toss up"), the case before us is not on the merits as clearly one-sided as counsel for each party asserts.[1] When a district court

---

1. Each side accuses the other, unfortunately with some justification, of misstating the record. Each side at various points argues "past" the other, simply ignoring arguments, authorities, and facts cited. Those practices disserve the purpose of briefs, which is to aid the court in

has struck a balance on a comparatively evenly balanced record, a basis is lacking for an appellate court's striking a contrary balance. The issue is not whether this court would have granted or denied the present motion for preliminary injunction, but whether the record is such that the district court's action could have resulted only from an abuse of discretion, error of law, or misjudgment of evidence.

Litton's Achilles Heel on this record is its insistence on postponing identification or description of such a broad universe of *thousands* of unidentified trade secrets as to require an extraordinarily sweeping injunction entitling it to veto disclosures necessary to Sundstrand's conduct of its business.

The district court's denial of the injunction and this court's affirmance of that denial on appeal should not, of course, prejudice, presage, or influence the outcome of the trial on the issue of misappropriation.

### (1) *The District Court's Findings*

Litton says this court must review the district court's findings with strict scrutiny, because it says, mistakenly, that the district court copied Sundstrand's proposed findings and thereby abused its discretion.

Sundstrand secured the transcript and prepared, in compliance with the court's instructions, twenty-one findings that repeated verbatim or closely paralleled the oral rulings of the court. As above indicated, the district court rejected and modified nine prepared findings. The six modified findings are those most relevant here, while those adopted are related primarily to background facts. Litton has not shown that the district court "blindly" adopted the proposed findings. On the contrary, the district court acted, as it said, after "having carefully reviewed all of the voluminous submissions of the parties", and after "having heard the argument of counsel."

There is no requirement that a district court refuse to adopt proposed findings it finds fully supported in the evidence. Such findings are no less those of the district court because they were proposed by counsel. Unlike the circumstances in *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 221 USPQ 481 (Fed.Cir.1984), the district court's findings here are its own and are sufficiently supported in the record. Litton's citation of excerpts from depositions and assertion that those parts are contradicted, if at all, only by counsel's arguments, is insufficient in view of the entire record to warrant a determination that the court's findings in the present case are clearly erroneous.

In sum, Litton has shown no basis on which this court could deny the district court's findings the deference required by FRCP 52(a), and has shown no basis for its implication that an abuse of discretion occurred in the process by which the district court made its findings.

### (2) *The Burden*

Litton had the burden of demonstrating either a combination of likelihood of success on the merits and irreparable injury or that, serious questions being raised, the balance of hardships tipped sharply in its favor. *Benda*, 584 F.2d at 314–315.

The district court applied the proper standard. It initially applied the first test and determined that Litton had failed to establish a likelihood of success on the merits. Recognizing that a serious question had nonetheless been raised, the court went on to find that the balance of hardships tipped sharply against a grant of the injunction.

Litton argues that the district court imposed a burden of demonstrating certainty. The argument is meritless. The court said at the May 30 hearing:

> We are here on the plaintiff's motion for preliminary injunction, and of course we

reaching a correct and just decision; on the contrary, they unnecessarily burden the court with no counteravailing advantage. The court will not under such circumstances undertake

the further burden of balancing the abuses, but will leave each side to bear its own costs and attorney fees.

are aware of the applicable standards here, to wit the likelihood of success on the merits and the possibility of irreparable harm are [sic, or] serious questions going to the merits and the balance of hardships tipping decidedly in favor of the moving party. The standards are obviously looked upon as a continuum.

### (3) *Likelihood of Success*

The parties' arguments on appeal succeed only in confirming the district court's "toss up" evaluation of the evidence on the merits. Because of Litton's burden, however, its arguments have been given careful consideration.

In seeking to overturn the district court's determination that it had not shown a likelihood of success on the merits, Litton relies on these alleged facts: (1) former Litton employees now work for Sundstrand; (2) some former Litton employees have documents acquired at Litton; and (3) six of the hundreds of items used in manufacture and testing of Sundstrand's RLGs bear resemblance to items used by Litton. The argument, relying as it does on implications and assumptions, is not persuasive.

The record establishes that employee mobility is common in the industry, particularly in relation to manufacture and sale of RLGs. Employers other than Sundstrand have employed former employees of Litton. Litton itself hired many former employees of competitors making RLGs. A competitor other than Litton hired two former Sundstrand employees and solicited other Sundstrand employees.[2] Employees must remain free to change employment. Though they must not take or convey a former employer's trade secrets, the court cannot assume from the mere fact of transfer that they have done so. Litton makes

much of Sundstrand's "rapid" and "wizard-like" development of an RLG. Sundstrand counters with the hundreds of RLG patents and publications, the years during which RLGs have been marketed, and its $12,000,-000 development effort. The disputed inferences again merely reflect the balanced nature of the present record on the merits.

With but two innocuous exceptions, none of the documents retained by former Litton employees appears to have ever been used. The exceptions were a drawing of part of a no-longer-used alignment stand and an obsolete Litton proposal. Litton cites testimony of one of its witnesses on use of retained documents and Sundstrand cites contrary testimony of two of its witnesses. We do not sit to review testimony *de novo*, nor can we say the district court should have credited Litton's witness and disbelieved those of Sundstrand. The record appears clear that no retained document was used after Sundstrand purchased Optec in March 1982.

That six items used in manufacturing and testing RLGs at Litton resemble corresponding items at Sundstrand does not in itself so establish existence of trade secrets or their misappropriation as to require reversal in this case. It would be surprising if there were no resemblance between items used by two competitors to manufacture and test the same type of product.

Indeed, Litton's arguments on appeal appear to assume resolution in its favor of the threshold issue, i.e., whether trade secrets are in fact present. *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1331 (9th Cir.1980). The Supreme Court has said that "those against whom an injunction is issued should receive fair and precisely drawn notice of what the

---

**2.** Messrs. Zingery, Hostetler, Hutchings, Babcock and Hemmingson all worked on a competitor's RLG project before moving to Litton where they developed its RLG. Since then, Messrs. Zingery, Hemmingson and Babcock have left Litton to work for third parties making RLGs. Messrs. Kalb and Ammons and Ms. Armendula made mirrors for Litton and have since gone to three separate competitors, where they make mirrors. Mr. Lysobey, now in charge of one facet of Litton's RLG effort, spent five years with two competitors developing ring laser gyros before he joined Litton. Messrs. Chechile, Butler and Norvell came to Litton after working on RLGs at three different competitors. Mr. Norvell has returned to his former employer. Litton hired RLG scientists from a competitor which in turn hired RLG scientists from Litton.

injunction prohibits". *Granny Goose Foods, Inc. v. Brotherhood of Teamsters,* 415 U.S. 423, 444, 94 S.Ct. 1113, 1126, 39 L.Ed.2d 435 (1974).[3] The district court did not err in determining that Litton had failed to carry its basic burden of pleading and showing facts that establish the existence of subject matter capable of protection as a trade secret in the manner provided for in the requested injunction.

Litton faults the district court for not making specific findings on whether any trade secrets were misappropriated, whether and why Sundstrand disclosed trade secrets[4] and might do so in future, why Sundstrand stipulated to the TRO if a preliminary injunction would be so onerous, and why Sundstrand suffered no hardship for five months. The allegation need not detain us long. The district court was at full liberty to draw adverse inferences from what it saw as Litton's failure to list its thousands of claimed secrets and to credit, for the purposes of the motion, Sundstrand's showing of a likelihood that what Litton was calling trade secrets was more likely to prove public knowledge at trial. That Sundstrand was in the development phase of its RLG business during the TRO period defeats Litton's attempt to argue that a stipulated TRO guarantees entry of a corresponding preliminary injunction.

The district court was equally at liberty, in viewing the sweeping relief sought by Litton as unjustified, to determine from the patents, reports, articles, and declarations in the record that at least the broad categories of information referred to by Litton as constituting its trade secrets could well be found at trial to constitute matters of public knowledge.

■ Matters of broad public knowledge or of general knowledge in an industry cannot constitute confidential information or trade secrets. *Hollingsworth,* 622 F.2d at 1332. The principle was reiterated in *Mayview Corp. v. Rodstein,* 480 F.2d 714 (9th Cir.1973), in which a preliminary injunction was reversed. The Ninth Circuit stated:

> For equitable protection, it generally must be shown that a customer list was in fact a trade secret or confidential information, and not generally known or publically available. *Id.* at 718–19, n. 7.

The primary authority cited by Litton, *Clark v. Bunker,* 453 F.2d 1006, 172 USPQ 420 (9th Cir.1972), holds that a trade secret cannot consist of information that is common knowledge, even where the information is imparted in the context of a confidential relationship:

> Logically it might seem that if a breach of confidential relationship occurs it should be irrelevant that the information used or disclosed is readily available. The rule is to the contrary ... [It] is difficult to conceive of any case in which the confider would be damaged and the confidant benefited by the confidant's use or disclosure of information known to all.

*Id.* 453 F.2d at 1010, n. 5 (citation omitted).

*K–2 Ski Co. v. Head Ski Co.,* 506 F.2d 471, 183 USPQ 724 (9th Cir.1974) and *Tri-Tron Int'l v. Velto,* 525 F.2d 432, 188 USPQ 177 (9th Cir.1975), cited by Litton, are clearly distinguishable. The courts in those cases weighed the evidence and de-

---

**3.** The district court, in its Conclusion No. 4, said that "ordinarily a preliminary injunction will not issue in a trade secrets case until the alleged trade secrets have been identified with sufficient particularity to satisfy Rule 65 of the Federal Rule of Civil Procedure". Sundstrand's argument that the injunction Litton seeks would violate Rule 65 merely confirms the existence of a "serious question on the merits" found by the district court. We need not, as the district court did not, determine the applicability of Rule 65 in view of our affirmance of the district court's finding on relative hardship.

**4.** Litton says Sundstrand disclosed a passive alignment system before the complaint was filed. The injunction sought, however is not against disclosure of that or any other particular secret. It is an injunction requiring submission by Sundstrand of *every* disclosure it wishes to make. Litton notes that an injunction against disclosures already made would be futile.

termined that the trade information, a ski laminating technique and an electromagnetic scaling process respectively, were unique and not generally known in the respective trades. On the present record, the district court's determination that Litton had not sufficiently shown that the information it seeks to protect is unique and generally unknown in the trade to establish a likelihood of success must be affirmed.

Litton's reliance on *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 192 USPQ 71 (9th Cir.1976), is equally unavailing. The court there dealt with the shift to the defendant of the burden of going forward with evidence to prove at trial that it independently invented the process after it has been established that a specific secret had been disclosed to the defendant and that disclosure was followed by the defendant's manufacture of a closely similar device. *Droeger* thus dealt with burden of proof at trial on the issue of misappropriation. The denial of a preliminary injunction of the type and breadth here sought cannot be equated with the circumstances discussed in *Droeger*. Further, if the burden of establishing at this preliminary stage the probability that it developed its RLG's from public knowledge shifted to Sundstrand, we cannot say that the district court could not have determined that Sundstrand met that burden.

Thus Litton has not shown on this appeal that the district court erred in determining that a likelihood of success on the merits had not been so established by Litton as to warrant a grant of the particular preliminary injunction sought.

### (4) *Irreparable Injury*

Litton cites *American Eutectic Welding Alloys Sales Co. v. Rodriguez*, 480 F.2d 223 (1st Cir.1973), in which it was held that a petitioner does not have to demonstrate that it has already suffered irreparable injury. The court went on to hold in that case, however, that a petitioner does have to demonstrate that, without the requested relief, irreparable injury would occur. The district court here did not require proof of existing injury, and Litton's failure to establish existence of its thousands of trade secrets constituted a failure to carry its burden of showing an imminent irreparable injury that was real and concrete. *Los Angeles Memorial Coliseum Comm'n. v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980).

The district court found: that the hardship Litton would incur if the injunction were denied is "that its trade secrets *might* be made public" (emphasis the court's); that Litton had "not demonstrated it would suffer irreparable harm if the requested relief is not granted"; and that "insofar as Litton may prove some culpability upon a part of the defendants, the harm, if any, may be compensable by damages". We cannot say, on the entire record, that those findings are clearly erroneous.

It is not the law that a preliminary injunction against use or disclosure of trade secrets can never be obtained. One who misappropriates the trade secrets of another is not free to use or disclose them. An injunction against use and disclosure of a secret that has been shown to have been misappropriated would preserve and not alter the proper status quo under the law. Litton's basic difficulty in showing irreparable harm lies in the determination by the district court that it failed to establish a likelihood that it would at trial succeed in proving the existence and misappropriation of trade secrets such as would warrant the type of injunction sought. Hence, its repeated assertion that the preliminary injunction it seeks is required to prevent a non-recoverable loss of its trade secrets, and thus to prevent an injury not reparable in damages, cannot prevail in light of the present record.

### (5) *Relative Hardship*

An injunction should not be granted if its impact on the enjoined party would be more severe than the injury the moving party would suffer if it is not granted. *County of Alameda v. Weinberger*, 520 F.2d 344, 349 (9th Cir.1975). The parties here agree that the test is "relative hardship to the parties." *Benda*, 584 F.2d at

315. Litton describes Finding No. 12 (on injury to Sundstrand) as the "key finding". In view of the "serious question on the merits", it can be said that the decisions of the district court and of this court turn primarily on a fair evaluation of relative hardship.

The district court found that entry of the preliminary injunction sought by Litton would be catastrophic to Sundstrand and its units. The specificity of the district court's findings illustrates its evaluation of the voluminous record in determining that the balance of hardship tips sharply against granting the injunction.

Mr. Meldrum, Vice President and General Manager of the Instrument Systems Division of SDC, stated that continuation of the TRO or issuance of the preliminary injunction would be devastating for Sundstrand. Similarly, Mr. William R. Kopp (Kopp), the Group Vice President responsible for SDC, Global, and Optec, stated that the consequences would be devastating if Optec were to be prevented from continuing to develop its product, a result that would occur if it could not freely communicate with potential and existing customers and suppliers. Failure to deliver RLGs, said Kopp, would result in breach of existing sale contracts and loss of $12,000,000 of investment, would directly impact 350 jobs, and would cause the loss of over $60,000,000 in projected sales over the next five years.

Litton argues strenuously that its requested injunction would not prevent Sundstrand's *use* of Litton's secrets, but only their disclosure, and that its "clearance" mechanism would enable Sundstrand to disclose enough non-secret information to compete for sales. The argument has a superficial ring of logic, but that ring is muffled by the actual workings of the involved marketplace. Litton and Sundstrand are competitors and are required to disclose their technology to customers and prospective customers, to vendors of components used in RLGs, and to the Federal Aviation Administration (FAA). The requested injunction would require Sundstrand, which is new in the field, to conduct its business with Litton looking over its shoulder, reviewing and then approving or vetoing every communication of Sundstrand concerning RLGs. It would require Sundstrand to refuse or defer answers to customer's, supplier's, and the FAA's questions until Litton's permission could be obtained. It would entail, or at least risk, disclosure to Litton of any secrets that may be developed on its own by Sundstrand.

As the district court noted, Sundstrand would be at risk of contempt if it disclosed anything not permitted by Litton, and the parties would have to return to court to safely settle every dispute over whether a particular disclosure should be permitted.

Litton's argument rests on an assumption that "use" means use only in manufacturing, though its failure to specifically identify its thousands of secrets precludes acceptance of even that assumption on this record. The argument rests on the further assumption that Litton does have trade secrets and that they are of a type that are normally subject to disclosure in attempting to sell RLGs, in obtaining parts, and in gaining government approval. Thus the requested injunction would limit use in each of those activities, and Litton's argument that no evidence supports the district court's finding that the injunction would risk loss of sales and jobs at Sundstrand is without merit.

Equally without merit is Litton's argument based on the two uses of the approval mechanism during the five months of the TRO, while Sundstrand was preparing to market RLG's. As above indicated, one such use involved a general information sheet that had been widely disseminated before entry of the TRO. The other involved a government report tailored by Sundstrand to conceal details of its own current research. There is no basis in the record for Litton's assertion that experience under the TRO establishes a tilt toward it in evaluating the relative hardships involved in the denial or grant of the requested injunction.

Litton relies heavily on *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 219 USPQ 962 (7th Cir.1983), the only case it cites involving a preliminary injunction somewhat similar to that sought here. In *Syntex,* however, the injunction dealt with a narrow and carefully described "procedure for manufacturing silicone monomers" and "casting with polymer rods using silicone monomers". The only disclosure involved was at the election of the enjoinee which, if in doubt, could approach the court. The limited and specified trade secret area in *Syntex* cannot be compared to the "thousands" of unidentified trade secrets in this case; nor can the limited disclosure provision of the injunction in *Syntex* be compared with the requirement for pre-clearance of *all* disclosures in the preliminary injunction sought here.

The foregoing discussion confirms the correctness of the district court's denial of an injunction pending appeal in view of the greater relative hardship that would befall Sundstrand.

### (6) *The Status Quo*

The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits. *King v. Saddleback Junior College District,* 425 F.2d 426, 427 (9th Cir.1970), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971). The status quo to be preserved is that state of affairs existing immediately before the filing of the litigation, the last uncontested status which preceded the pending controversy. *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.), *cert. denied,* 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963). In *Tanner* the Ninth Circuit dissolved a preliminary injunction on the basis that "... it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial. This is particularly true wher the relief afforded, rather than preserving the status quo, completely changes it." *Tanner,* 316 F.2d at 808–09.

The injunctive relief sought by Litton, barring Sundstrand from disclosing to anyone any aspect of RLG technology except those aspects that might be permitted by Litton's designee, would not preserve the status quo. Before this litigation was brought, Litton and Sundstrand were free to compete in the manufacture and sale of RLGs and products utilizing RLGs. Neither had to "clear" with the other its disclosures to customers, prospective customers, suppliers, or the government. Had the requested preliminary injunction been entered, that state of competition, that "status quo", would have been drastically altered.

Litton argues for maintenance of a post-complaint status quo, namely, the state of affairs after the district court entered the TRO. *That* status quo would of course be preserved by the requested preliminary injunction which contains the same restrictions as the now-dissolved TRO. However, a status quo created by a TRO is not the status quo which preliminary injunctions are designed to preserve. If it were, every TRO would automatically entitle every petitioner to a grant of a preliminary injunction identical to the TRO.

The district court determined that the prelitigation status quo would best be preserved by permitting the parties to return to the state of free and untrammeled competition in the marketplace existing before the TRO was entered. Litton's argument, without citation of authority, for preservation of a post-TRO status quo is without merit. Litton further argues that Sundstrand's pre-TRO disclosure means that the only status-quo to be preserved is that reflected in the TRO. That argument does not establish, however, that the district court abused its discretion, committed an error of law, or seriously misjudged the evidence when it denied on this record the sweeping preliminary injunction sought by Litton in view, particularly, of the strong tilt of relative hardship against a grant of that injunction.

Each party will pay its own costs and attorney fees.

AFFIRMED.